**IN THE UNTIED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**DR. BUFFORD SATCHER**                                        **PLAINTIFF**

**V.**                          **5:04CV00317 JMM**

**BOARD OF TRUSTEES OF THE**
**UNIVERSITY OF ARKANSAS, governing**
**board of the University of Arkansas at**
**Pine Bluff ("UAPB"), et al,**                                  **DEFENDANTS**

<u>**ORDER GRANTING SUMMARY JUDGMENT**</u>

Pending is the Defendants' Motion for Summary Judgment, Plaintiff's Motion for Partial Summary Judgment, Plaintiff's Motion to Amend, Defendants' Motion to Deem Admitted Statement of Undisputed Facts and Defendants' Motion to Strike.

The Defendants' Motion for Summary Judgment was filed in this case on July 24, 2007. At the Plaintiff's request, the Court granted a motion to continue the trial and a motion for extensions of time for Plaintiff to file a response to the Motion for Summary Judgment and to conduct discovery.  The Court gave Plaintiff an additional five months to conduct discovery and an additional  month thereafter to file his response to the Defendants' Motion for Summary Judgment.  The Court did not extend the deadline for filing motions for summary judgment.

On March 7, 2008, four days past the deadline, Plaintiff requested an additional week to file his response. Plaintiff's response was finally due on March 10, 2008.  Plaintiff failed to file his response to the Motion or to controvert the Defendants' statement of facts as required by Local Rule 56.1(b) on March 10, 2008.

Instead, Plaintiff filed a Motion for Partial Summary Judgment.  However, this Motion failed to comply with the Court's Scheduling Order (Docket # 27) or Local Rule 56.1(a) which states that a short, concise statement of the material facts as to which the movant contends there is

no genuine issue to be tried shall be attached to the motion.  Further, there was no brief

supporting the Plaintiff's Motion.  On March 11, 2008, Plaintiff filed his Statement of Disputed

Facts along with a Status Report and a Statement of Undisputed Facts supporting his motion for

partial summary judgment.  Although the Plaintiff failed to *timely* controvert the Defendants'

Statement of Facts, the Court will accept the Plaintiff's Statement of Disputed Facts.  *But see

Newingham v. Norris,* Case Number 5:06CV 00127 JMM, Docket # 107 (February 25, 2008);

*Caffey v. Miller*, Case Number 4:05CV01124 GTE, Docket # 51(October 24, 2007); *Beavers v.

Bretherick*, 227 Fed. Appx. 518 (8th Cir. 2007)(unpublished).   Defendants' Motion to Deem

Admitted Statement of Undisputed Facts is DENIED.

   For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is

DENIED.  Defendants' Motion for Summary Judgment is GRANTED.  Plaintiff's Motion to

Amend his Complaint is DENIED as futile.  Defendants' Motion to Strike is MOOT.

<u>Facts</u>

   Plaintiff, Dr. Buford Satcher, is a former employee of the University of Arkansas at Pine

Bluff ("UAPB").  Dr. Satcher began his employment at UAPB in 1981, and he was tenured as a

Professor of History in July 1987.  Dr. Satcher is African American.

   Defendant, Board of Trustees of the University of Arkansas, is a body politic and

corporate, organized and existing under the laws of the State of Arkansas.  The Board of Trustees

is the governing body for the University of Arkansas, its campuses and divisions, including

UAPB.

   Dr. Lawrence A. Davis, Jr., a former defendant in this lawsuit, is Chancellor of UAPB.

Dr. Davis is the one who actually terminated Dr. Satcher, upon recommendation from the

Dean of the School of Arts and Sciences, then Dr. William Willingham, and with agreement from the Vice Chancellor for Academic Affairs, Dr. Mary Benjamin.  Dr. Davis is African American.

Dr. Mary Benjamin, a former defendant in this lawsuit, is Vice Chancellor for Academic Affairs at UAPB.  Dr. Benjamin is African American.

Dr. William Willingham, a former defendant in this lawsuit, was the Dean of the School of Arts and Sciences at UAPB during the time of the complained of events.  Dr. Willingham died in the Fall of 2006.  Dr. Willingham was African American.

Defendant Dr. Ebo Tei is Chair of the Department of Social and Behavioral Sciences in the School of Arts and Sciences at UAPB, and he has served in that capacity since August 1997. Dr. Ebo Tei is African American.  (Def.'s Ex B at p. 1).

The Department of Social and Behavioral Sciences is comprised of the following programs: gerontology, social work, criminal justice, sociology, psychology, history, social studies, and political science.  The Department of Social and Behavioral Sciences is a part of the School of Arts and Sciences.  As far as campus hierarchy, the faculty in the Department of Social and Behavioral Sciences report to the chair of the department; the various department chairs report to the Dean of the School of Arts and Sciences; the dean reports to the Vice Chancellor for Academic Affairs; the vice chancellor, in turn, reports to the Chancellor.  All chairpersons serve at the pleasure of the Chancellor.  (Def.'s Ex. A).

As far as background history, beginning in June 1990, and continuing through August 1997, the Department of Social and Behavioral Sciences was headed up by a number of *interim* chairpersons.  Dr. Satcher was the fourth interim chairperson; he was appointed in September 1996 to serve for one semester.  In November 1996, Dr. Satcher was reappointed to

serve the following Spring 1997 semester, and that appointment continued until August 1997, when Chancellor Davis rescinded Dr. Satcher's administrative appointment as interim chairperson, and named Dr. Tei as chair.  (Def.'s Ex. B at p.2).

Dr. Satcher responded to the change in leadership by filing a lawsuit against Dr. Tei, members of the search committee designated to find and interview chair candidates, the Vice Chancellor for Academic Affairs, the Chancellor, and the University of Arkansas Board of Trustees, claiming that the rescission of his interim appointment violated his due process rights under the Constitution and that his First Amendment right to freedom of speech was violated in that he was retaliated against for speaking out against actions taken by employees of UAPB.  Dr. Satcher's first lawsuit was styled *Dr. Buford Satcher v. Board of Trustees of the University of Arkansas, governing board of the University of Arkansas at Pine Bluff; Dr. Ebo Tei, individually and in his official capacity; Dr. Mary Benjamin, individually and in her official capacity; Dr. Stephen Tai, individually and in his official capacity; Patricia Wilkinson, individually and in her official capacity; Bert Wyatt, individually and in his official capacity; and Dr. Lawrence A. Davis, Jr., in his official capacity*, United States District Court for the Eastern District of Arkansas, Pine Bluff Division, No. PB-C-99-45.  The defendants to that first lawsuit denied all of Dr. Satcher's allegations.  (Def.'s Ex. B at p.2).

Immediately prior to trial, Dr. Satcher and the defendants agreed to settle the claims.  Dr. Satcher received $1,474.58, and his attorney received $13,525.42.  Specifically negotiated into the Settlement Agreement was the requirement that "[a]ll parties promise to use their best efforts to promote a spirit of harmony within the Department of Social and Behavioral Sciences and, in working together, agree to strive to restore and promote vital working relationships with the

Department to the maximum extent possible."  The Settlement Agreement was signed by all parties on January 31, 2000.  (Def.'s Ex. B at p. 2).

The University of Arkansas permits eligible faculty members to take, as a privilege, off campus duty assignments, i.e. sabbatical leave, designed to enhance the individual's value to the institution.  At the University of Arkansas, sabbatical leave is governed by Universitywide Administrative Memorandum No. 435.4, which requires that "[w]ithin sixty days after returning to the campus from an Off-Campus Duty Assignment, the faculty member or administrator must submit a written report of his or her activities and accomplishments during the Off-Campus Duty Assignment to the chairperson of his/her department, the dean of the college, the chief academic officer, the Chancellor, and the President."  (Def.'s Ex. A; A-6).

Dr. Satcher initially requested sabbatical leave in September 1998.  In a handwritten letter to Dean Willingham dated September 20, 1999, Dr. Satcher indicated he was conducting research on "a number of projects in the areas of secondary education and higher education" and that "this research would be published and that there was a possibility of making a movie from it."  (Def.'s Ex. A).

Dean Willingham wrote to Dr. Benjamin explaining Dr. Satcher's project and, by copy of the letter to him, requested Dr. Satcher "submit his written report on the project on or before January 31, 2000."  (Def.'s Ex. A).  Dr. Benjamin subsequently recommended approval of the sabbatical leave to Chancellor Davis, and in a letter to the Chancellor dated September 28, 1999, she wrote that "[d]uring this time, Dr. Satcher is to do research on black schools in Pine Bluff prior to the Brown vs. Topeka, Kansas Board of Education decision. Dr. Satcher has been

asked to submit the report of his work on or before January 31, 2000." Chancellor Davis approved the sabbatical, but it was specifically conditioned upon Dr. Satcher's providing a written product resulting from his sabbatical leave. (Def.'s Ex. D at p. 3; Ex. D-1).

Dr. Satcher took sabbatical leave during the Fall 1999 semester. In accordance with University policy, Dr. Satcher received full salary from UAPB for the Fall 1999 semester while he was on sabbatical. Upon his return to campus, Dean Willingham reminded him to file a report on his sabbatical leave on or before January 31, 2000. Dr. Satcher failed to submit the report. (Def.'s Ex. A). On February 3, 2000, Dean Willingham wrote to Dr. Satcher requesting the report. Dr. Satcher did not respond. Dean Willingham sent Dr. Satcher an additional letter on February 28, 2000, in which he enclosed the February 3rd letter and noted that Dr. Satcher had failed to respond. Dr. Satcher did not respond to this letter either. (Def.'s Ex. A).

On April 18, 2000, Dean Willingham wrote to Dr. Benjamin recommending Dr. Satcher reimburse the University for the leave taken during the Fall 1999 semester since he refused to produce any report on his work. On April 18, 2000, Dr. Satcher submitted a handwritten response to Dean Willingham, simply stating he had a "number of reasons why he did not respond" to the dean's requests. Again he refused to provide the requisite report. (Def.'s Ex. A). However, Dr. Satcher offered to show the Dean some of his research. (Def.'s Ex. A-10; Pl.'s Ex. 20). On May 8, 2000, Dr. Benjamin wrote Dr. Satcher and instructed him to inform her why his report had not been presented. She further instructed Dr. Satcher to present it by June 30, 2000. (Def.'s Ex. C at p. 4; Ex. C-2). He did not. Dr. Satcher never provided the requisite report on his sabbatical leave activities, nor did he reimburse the University for his full salary received during his time away. (Def.'s Ex. A; Pl's Dep. At p. 140-141; Def.'s Ex. C at p. 4).

As soon as the parties to the first lawsuit had reached an oral agreement to settle, Dr. Tei called two very short emergency meetings for January 19, 2000, one general department meeting and the other for the faculty in the history and social studies programs.  Dr. Tei scheduled the January 19th meetings for the purpose of introducing Dr. Satcher's return to the history and social studies programs as coordinator.  Dr. Satcher refused to attend the January 19th meetings; as a result, Dr. Tei cancelled the meetings, to be rescheduled at a later date.  (Def.'s Ex. B at p. 2-3).

On January 26, 2000, Dr. Tei sent a memorandum to the social studies faculty, including Dr. Satcher, and requested every faculty member submit a current vita to comply with the impending accreditation (NCATE) visit.  Dr. Satcher failed to provide his vita.   (Def.'s Ex. B at p.3).  As a follow-up to the meetings Dr. Tei had to cancel on January 19, 2000, Dr. Tei issued a memorandum to the department announcing that the first full meeting for all faculty members was scheduled for February 11, 2000 at 2:00 p.m..  At this meeting, Dr. Tei was going to introduce Dr. Satcher as the history coordinator.  The night before the meeting, Dr. Satcher told Dr. Tei's secretary he would be unable to attend.  Despite Dr. Satcher's refusal to attend, and in compliance with the terms of the Settlement Agreement, Dr. Tei went forward with the meeting and announced to the faculty that Dr. Satcher would be performing the role of history and social studies coordinator for the department.  (Def.'s Ex. B at p.3).

Dr. Tei sent another memorandum to all graduate, history, and social studies faculty scheduling a meeting for Friday, February 25, 2000 at 2:00 p.m., to discuss the approved history and social studies degree plans which has been approved by the Faculty Senate and implemented by the Chancellor during Fall 1999, to discuss proposed revisions in the

graduate degree plan, and to discuss preparations for the NCATE visit.  On the evening of the 24th, Dr. Satcher sent Dr. Tei a memo stating he would not attend.  Because Dr. Satcher failed to attend the meeting on the approved degree plans, Dr. Tei sent him a copy of the plans on February 25, 2000, and asked him to expand on the course descriptions for two of the courses.  Dr. Satcher ignored Dr. Tei's request.  (Def.'s Ex. B at p. 3-4; B-2).

Throughout the Spring 2000 semester, whenever Dr. Tei would send memoranda to the program coordinators, including Dr. Satcher as the history coordinator, Dr. Satcher would refuse to perform the work or attend any of the scheduled meetings; examples of this included work for the Arkansas Department of Higher Education (ADHE) program reviews and for Academic Assessment Workshops. (Def.'s Ex. B at p. 4).

Dr. Tei scheduled a meeting with Dr. Satcher and another history professor on Friday, April 7, 2000 at 2:00 p.m., for an update on the rejoinder to the Social Studies portfolio.  Dr. Satcher refused to attend the April 7th meeting.  Rather, Dr. Satcher provided a note to Dr. Tei stating that he had other things to do and that he would get an update on NCATE later.   (Def.'s Ex. B at p. 5).

Dr. Tei sent Dr. Satcher a memo requesting that Dr. Satcher be present on Lion Fever Day (March 31, 2000) to meet with high school students who were visiting the campus.  Dr. Satcher was not on campus that day.  On a subsequent Advisement Day, all faculty members were requested to be in place for advisement beginning at 10:00 a.m.  Dr. Satcher did not arrive until 12:30 p.m.  Dr. Tei sent out a memo on March 30, 2000, requesting Web page information for the history and social studies programs to be submitted by April 3.  Dr. Satcher never submitted any information.  (Def.'s Ex. B at p. 5).

On April 18, 2000, the difficulties were pervasive enough with Dr. Satcher that Dr. Tei drafted a letter to him addressing the various issues he perceived to be problematic.  Dr. Tei copied Dean Willingham and Dr. Benjamin in order for them to be informed as to the ongoing problems with Dr. Satcher.  In response to Dr. Tei's April 18th letter, Dr. Satcher sent Dr. Tei a letter filled with insubordinate remarks, including:

> [T]he next suit filed will not be settled out of court. You can believe that there will be another one and this time it will be a major class action suit with many students and parents involved.

> I also understand that the department is not moving at any pace at all. I have worked in a number of departments and this is the worst that I have ever experienced. This department began to deteriorate in the fall of 1997. [Note: Dr. Tei became department chair in the fall of 1997.]

> One faculty member accused me wrongly of something during a meeting. . . . If you would like to know whom that faculty member was, wait until the next suit is filed.

> I would like to suggest that you visit my class that I am late attending. Perhaps, you may find out that I am purposely late to make sure that all the students are there before I am. You may also learn that students are allowed to carry on class if I am not on time. Moreover, you may learn that I can keep them longer to make up for my tardiness or for theirs.

> I am sure that you are aware by now that faculty members within the department and without are aware of how you got the position that you hold. Staff members on campus are also aware. They feel that you and others are imposters and hypocrites. It is also felt that you are a liability to the university.

> It would be of great benefit to you to bring yourself down off of that imaginary superiority roller coaster that you are riding. Perhaps you do not know that you turn people off with an egotistical, self-centered attitude. Some have stated that it is only a cover up for insecurities.

> Vengeance is mine saith the Lord.

> I am dedicated to the profession and I do not need a charlatan like you watching to see if I am late to class. . . . In addition, I do not appreciate your writing to me about missing meetings that you call for you [sic] own ego.

Sometimes, it appears that you really believe that you are a real psychologist.

He signed the letter "Buford Satcher, One of God's Disciples."

(Def.'s Ex. B-7).

Following receipt of Dr. Satcher's letter, Dr. Tei wrote to Dr. Benjamin and requested her assistance. In the letter, Dr. Tei voiced concerns about his physical well-being. (Def.'s Ex. B-8). In response, Dr. Benjamin requested Dean Willingham work with Dr. Satcher and Dr. Tei to resolve the problems. (Def.'s Ex. C at p. 5). On June 2, 2000, Dr. Willingham sent a memorandum to both faculty members requesting that they meet with him to discuss working relationships in the Department of Social and Behavioral Sciences and to bring to the meeting a copy of the Settlement Agreement. While Dr. Tei made himself available to meet, Dr. Satcher refused to respond to Dean Willingham's request. (Def.'s Ex. A). Dr. Satcher claims he refused to attend the meeting unless he was allowed to tape record it. (Pl.'s Ex. 43).

In August 2000, Dr. Satcher sent another letter to Dr. Tei, accusing him of "purposely be[ing] an accomplice in two cases of discrimination in this department" and stating that Dr. Tei "never did clarify the issue of History Coordinator." (Def.'s Ex. B-10). In response to this letter, Dr. Tei wrote again to Dr. Benjamin requesting help and informing her that Dr. Satcher had refused to come to two crucial department meetings held on August 16, 2000, and he had not given any reason for his non-attendance. (Def.'s Ex. B-11). Once again, Dr. Benjamin directed Dean Willingham to intervene. (Def.'s Ex. C-5). Dean Willingham sent a second request to Dr. Satcher and Dr. Tei to meet with him to discuss the Court settlement on August 30, 2000, at 10:00 a.m. Dr. Satcher failed to attend. (Def.'s Ex. A).

On September 6, 2000, Dean Willingham sent Dr. Satcher a letter regarding his failure to

attend the scheduled meeting and told him: (1) that the purpose of the meeting was for him to share his purported concerns that the University was not living up to the terms of the Settlement Agreement; (2) that he had asked Dr. Tei to provide him the expectations of the department coordinators; and (3) that he did not want them to lose focus on their primary responsibility of preparing students educationally for their chosen careers.  In the same letter, Dean Willingham instructed Dr. Satcher to bring to him future issues regarding the terms of the Settlement Agreement that he and Dr. Tei could not resolve.  Dr. Satcher did not respond.  (Def.'s Ex. A).

On Monday, October 9, 2000, Dr. Tei sent a memorandum to all of the coordinators scheduling a meeting for Thursday, October 12, 2000, at 11:00 a.m., to discuss a number of important departmental issues.  Although the meeting later had to be postponed until October 17th, Dr. Satcher failed to attend.  (Def.'s Ex. B at p. 8).  On October 20, 2000, Dr. Tei sent a memorandum to all of the Social and Behavioral Sciences faculty regarding the NCATE visit scheduled for Monday, October 23, 2000.  (Def.'s Ex. B-15).  Specifically, Dr. Tei directed Dr. Satcher to meet with the NCATE team.  Dr. Satcher failed to attend.  (Def.'s Ex. B at p. 8).

In November 2000, Dr. Tei sent out three memoranda regarding: (1) Dean Willingham's request that the faculty take the PRAXIS II examination in an effort to become familiar with both the content and question format; (2) the listing of 2000-2001 Coordinators and Academic Advisors; and (3) at the request of the dean, a document reflecting the responsibilities and functions of the program coordinators within the department.  (Def.'s Ex. B-16).  When Dr. Satcher received the November 2000 memos, he sent a letter containing, once again, a number of insubordinate statements directed toward Dr. Tei, including:

> [I]t was not necessary for you to send out a memo to the history faculty regarding the coordinator's responsibilities. I was coordinating the history program years before you

became a part of our department. . . . "[Y]ou did not appoint me as a coordinator and I do not think that you appointed anyone else. The history coordinator serves at the pleasure of the history faculty and the history majors within our program; we allow the students to decide. Moreover, students are also allowed to choose their advisor. Therefore, all of the rhetoric about serving at the pleasure of the chairperson is ridiculous. This is a democracy not a dictatorship where one person makes all of the rules. You make one believe that we are living in a communist regime.

There is no such thing as an "at will" appointment for the history program. The history students and faculty will notify the legitimate chairperson of whom they have chosen for the position. Moreover, the students and history faculty will also evaluate and review the position and pass it on to the genuine chairperson. The terms genuine and legitimate are used because the situation in our department is very much like the Presidential Election of 2000 in this country. The only difference is everyone that was involved in the process of selecting a chairperson in our department know that the procedure was a fraudulent one.

The history program has its own planning and advisory committee and we will advise the legal chairperson of our plans.

(Def.'s Ex. B-19).

The Settlement Agreement signed by Dr. Satcher in 2000 specifically provided that "[a]ll parties recognize that coordinator and graduate advisor positions are at-will appointments which require working in a cooperative and professional manner with the Chairperson of the Department of Social and Behavioral Sciences." Dr. Tei forwarded Dr. Satcher's November 2000 letter to Dean Willingham, with a copy to Dr. Benjamin, and he, once again, requested some show of support from the administration to assist with Dr. Satcher. (Def.'s Ex. B-20).

On January 18, 2001, Dr. Satcher began the Spring semester by sending Dr. Tei a memorandum where he addressed Dr. Tei as "History Coordinator" and telling him what classes he (Dr. Satcher) was going to teach for the Fall 2001 semester. (Def.'s Ex. B-21). Dr. Tei responded to the January 18th letter and reminded Dr. Satcher that the class schedules were already set and operating in the approved two-year cycles to ensure all required courses in the

program were offered in a timely manner so that UAPB students could graduate on time. (Def.'s Ex. B-22).

Throughout the Spring 2001 semester, Dr. Satcher continued to accuse UAPB administrators that they were not following the terms of Settlement Agreement.  In response, Dr. Tei, Dr. Willingham, and Dr. Benjamin repeatedly requested that he inform them as to which part they were not following, yet he never would provide them clarification.  (Def.'s Ex. C at p. 5-6).

On August 20, 2001, Dr. Satcher arrived late to a departmental meeting and began videotaping Dr. Tei and the other faculty without their consent.  In response to the above incident, Dr. Tei sent Dr. Satcher a letter asking him not to videotape faculty meetings again.  (Def.'s Ex. B-24).  Dr. Satcher responded to Dr. Tei's request on October 8, 2001, by further criticizing Dr. Tei, again threatening him with legal action, and, once again, demanding changes to the Spring 2002 schedule.  (Def.'s Ex. B-25).

As soon as the new semester started, on January 14, 2002, Dr. Satcher disrupted the historiography class being taught by another history professor, Dr. Richard Hillard.  Dr. Satcher walked into the class and began filming the students and Dr. Hillard.  (Def.'s Ex. H at p. 3-4).  This resulted in the two professors engaging in a dispute in front of the students.  Public Safety had to be called to diffuse the situation.  Dr. Hillard, not Dr. Satcher, was assigned to teach the historiography class.  (Def.'s Ex. A).

As a result of the January 14, 2002, videotaping incident, Dr. Benjamin called a meeting attended by Dean Willingham, Dr. Satcher, Dr. Tei, and her on January 16, 2002, during which Dr. Benjamin specifically asked Dr. Satcher to stop videotaping other professors' classes and to not attend any classes he is not assigned to teach unless he was part of a peer review study.

13

(Def.'s Ex. C at p. 6).   During the January meeting, Dr. Satcher contended that he, not Dr.

Hillard, should teach the historiography class.  He accused Dr. Tei of "doing more to destroy the

History department of UAPB than Osama bin Laden did to the United States," he threatened to go

back to Court and "reopen his case," and he requested that UAPB initiate a new search for a

chairperson for the Social and Behavioral Sciences Department.  (Def.'s Ex. A; Def.'s Ex. C at p.

6-7).

 In an effort to diffuse the tension within the department, Dean Willingham and Dr.

Benjamin met with Dr. Satcher again, without Dr. Tei present, on January 22, 2002.  The

administrators repeatedly asked Dr. Satcher to tell them how the Settlement Agreement had been

breached or how he was being discriminated against, which had been his recurring statements

over the past two years.  He was never able to articulate or substantiate his claims, even though he

kept assuring them he had documentation to "prove it."  Dr. Satcher said he did not have the

documents with him, but he promised to provide it to them.  (Def.'s Ex. C at p. 7).  Dean

Willingham even sent him a reminder to produce them.  Yet, Dr. Satcher never produced one

single document to support his allegations. (Def.'s Ex. A).

 In July 2002, six months after the police incident over the historiography course,

Dr. Benjamin received a letter from Dr. Satcher accusing her of requiring a police officer

to falsify the police report regarding the incident.  (Def.'s Ex. C-7).  Dr. Benjamin responded to

him that his letter contained a number of false statements and asked him to treat her in a

professional and truthful manner, as she had treated him.  (Def.'s Ex. C-8).

 During the Fall 2002 semester, Dr. Benjamin received a complaint from the Dean of the

Honors College that a student had complained that Dr. Satcher was teaching one of his core

curriculum Western Civilization courses as a course on Black-American history.  (Def.'s Ex. C at

p. 8).  Changing the course content of a class is an extremely serious matter in academia.  UAPB

determines the course content of the classes it offers through the governance process.  While the

professor may be the expert on that content, the professor does not set the content or alter it.  In

response to the complaint, Dr. Benjamin instructed Dean Willingham to investigate whether Dr.

Satcher had altered the course content of the Western Civilization class.  (Def.'s Ex. C at p. 8).

Dean Willingham, in turn, directed Dr. Tei to investigate this matter.  (Def.'s Ex. A).  Dr.

Tei learned that Dr. Satcher had not ordered any textbooks for the course, instead directing

students enrolled in the course to use a short brief on African-American History as a reference

text.  On December 10, 2002, Dr. Tei wrote to Dr. Satcher, informing him of the complaint and

the facts Dr. Tei discovered, explaining the seriousness of potential consequences if the content of

the course was unilaterally changed, and requesting Dr. Satcher to provide Dr. Tei with copies of

all course materials, including the course syllabus, assignments, term papers, quizzes, midterm

and final exams on or before December 16, 2002.  (Def.'s Ex. B-27).  Dr. Satcher failed to

provide the requested materials.  (Def.'s Ex. B at p. 12).

On January 22, 2003, Dr. Willingham wrote to Dr. Satcher requesting that he submit to

Dr. Willingham the course syllabus for HIST 1330, Western Civilization I, which he was

assigned to teach during the Fall 2002 semester, as well as all assignments, term papers, quizzes,

and copies of midterm and final exams.  Again Dr. Satcher failed to submit the requested

materials.  (Def.'s Ex. A).  Dr. Willingham followed up in a letter to Dr. Satcher on February 5,

2003, reminding him of the serious nature of the allegations surrounding the Western Civilization

I class during the Fall 2002 semester.  Dr. Willingham instructed Dr. Satcher to provide the

requested materials by February 15, 2003.  Dr. Satcher failed to do so.

15

On March 7, 2003, Dr. Willingham issued Dr. Satcher an official reprimand for insubordination.  The reprimand required Dr. Satcher to file with his departmental office,  and with copies to Dr. Willingham's office, all syllabi, midterm, and final examinations of any courses he was scheduled to teach.  In the March 7th reprimand, Dr. Willingham warned Dr. Satcher that failure to adhere to his directive would result in serious consequences.  Dr. Satcher never responded.  (Def.'s Ex. A).

Because of Dr. Satcher's continued failure to respond to the dean's instructions, on May 15, 2003, Dr. Willingham wrote Dr. Tei and informed him that unless Dr. Satcher furnished the requested information, he was not to teach during the summer sessions, nor was he to receive any merit salary increase for the 2003-2004 academic year.  Again, Dr. Satcher failed to produce the requested materials from the Fall 2002 semester.  (Def.'s Ex. A).  Dr. Tei informed Dr. Satcher of the dean's reprimand.  (Def.'s Ex. A-24).

On May 28, 2002, Dr. Satcher showed up at a history class and began videotaping.  Public safety was called and the officers eventually escorted Dr. Satcher from the room.  Later in the day on May 28th, Dr. Tei received a memorandum from Dr. Satcher wherein he wrote that "I will be teaching the History course that my name appears by in the schedule for the first Summer Session I.  I do not work in the School of Arts and Sciences. No one in that school should be telling me not to teach."  In the same letter, with regard to the Western Civilization course the administration had been attempting investigate, Dr. Satcher admitted "[t]hat course was taught the way that the class wanted it to be taught and the whole class agreed to it."  (Def.'s Ex. B-30). In response to Dr. Satcher's having disrupted the May 28th history class, Dr. Willingham sent him a letter that same date and advised him that if he showed up and disrupted the class again, Dr. Willingham would recommend his termination.  (Def.'s Ex. A-25).

One month later, on June 27, 2003, Dr. Tei sent Dean Willingham a letter requesting that Dr. Satcher be terminated.   (Def.'s Ex. B-31).  Dean Willingham responded to Dr. Tei that he was not prepared to accept his recommendation to terminate Dr. Satcher.  (Def.'s Ex. A-27).  On August 11, 2003, Dean Willingham wrote Dr. Tei and informed him that the administrators were going to discuss his recommendation.  (Def's Ex. A-28).

On August 21, 2003, Dr. Satcher appeared at the registration process for the students enrolled in the Social & Behavioral Sciences programs and began filming the students.  Dr. Satcher had not obtained consent to film the students, nor had he gone through Institutional Review Board processes to obtain permission to conduct research on students/human subjects. The students were upset by being filmed and, again, Public Safety was called to assist with stopping the filming and to diffuse the situation.  (Def.'s Ex. F).  Because of the numerous problems administration was experiencing with Dr. Satcher and because they wanted to gain a better understanding of what he perceived the problems to be, Chancellor Davis called a meeting for 11:00 a.m. on Monday, August 25, 2003, to be attended by the Chancellor, Dr. Benjamin, Dean Willingham, and Dr. Satcher.  (Def.'s Ex. A; Def.'s Ex. D at p. 4).    Chancellor Davis, Dr. Benjamin, and Dean Willingham all arrived for the August 25th meeting.  While they were waiting for Dr. Satcher to arrive, the Chancellor's assistant brought in a note and said Dr. Satcher had another commitment and would not be attending the meeting.   (Def.'s Ex. A; Def.'s Ex. D at p. 4).

Dean Willingham made the decision to go forward with a recommendation to terminate Dr. Satcher's tenure and employment with UAPB.  Dean Willingham's decision was based upon Dr. Satcher's unwillingness to perform his duties or fulfill his responsibilities to the University of Arkansas at Pine Bluff, including neglect of duty, insubordination, and creation of a hostile work

and study environment for members of the campus community.  The incidents over the past few years, including the volatile history of interactions with his department chair and other faculty, the videotaping of students, his repeated failures to respond to requests to meet to resolve the problems, and the concern over the course content with the Western Civilization class and the subject matter of what Dr. Satcher was teaching the students, left Dr. Willingham no other choice but to recommend his termination.  (Def.'s Ex. A).

In accordance with University of Arkansas Board of Trustees Policy No. 405.1, which is the policy governing tenured faculty, Dr. Willingham scheduled a meeting with Dr. Satcher and Dr. Tei on Friday, September 12, 2003, at 11:00 a.m., in Dr. Willingham's office.  (Def.'s Ex. K). Dr. Satcher failed to attend the meeting despite Dean Willingham's sending him notice via certified mail, U.S. mail, and hand delivery.  (Def.'s Ex. A, A-29, A-30).  Dr. Willingham had informed Dr. Satcher that the purpose of the meeting was to discuss the future of his employment with the University of Arkansas at Pine Bluff and that it was imperative that he attend this meeting.  In his deposition taken in conjunction with this lawsuit, Dr. Satcher testified that the reason he did not attend the September 12th meeting with Dr. Willingham is because he had a previously scheduled meeting with the campus's EEO officer, Dr. George Herts.  (Pl.'s Depo. at p. 385-86).  However, Dr. Herts has no recollection or documentation suggesting such a meeting was ever scheduled.  (Def.'s Ex. G).

The meeting scheduled for September 12th was to be the first step in Board Policy 405.1(IV)(C)(1) for preliminary proceedings in dismissing a person who has tenure rights.  Since Dr. Satcher refused to meet with Dr. Willingham, Dr. Willingham proceeded to the next step, which was to prepare a statement of the grounds for dismissal and send it to the Vice Chancellor for Academic Affairs, Dr. Benjamin, with a copy to Dr. Satcher.  That letter was dated September

30, 2003, and it was sent to Dr. Satcher via certified mail, U.S. regular mail to his home address, and hand delivery by Dr. Willingham himself. (Def.'s Ex. A, A-31). Dr. Satcher refused to take the letter from Dr. Willingham. (Pl.'s Depo. At p. 389-92). Dr. Willingham then slid the letter under Dr. Satcher's office door. Later that day, Dr. Satcher shoved the letter through Dr. Willingham's car window. Id.

The termination process continued with Dr. Benjamin forwarding the termination recommendation on to Chancellor Davis. Dr. Benjamin agreed with the recommendation to terminate Dr. Satcher. Thereafter, on October 31, 2003, Chancellor Davis sent Dr. Satcher a letter, via certified mail, regular mail, and hand delivery, that he was terminating his employment and all tenure rights with UAPB for unwillingness to perform his duties or fulfill his responsibilities to UAPB, including neglect of duty, insubordination, and creation of a hostile work and study environment for members of the campus community. (Def.'s Ex. D at p. 5-6). In accordance with UA Board policy, the termination was effective one year later, on October 31, 2004. In the letter of October 31st, Chancellor Davis specifically notified Dr. Satcher of his right to a pre-termination hearing on the matter. (Def.'s Ex. A; Def.'s Ex. D at p.5-6; D-3).

To ensure Dr. Satcher received a copy of the termination letter, Chancellor Davis mailed two copies of the letter to Dr. Satcher's home address, one by regular mail with no restrictions and the other by certified mail. (Def.'s Ex. D-3). Further, Chancellor Davis instructed his Executive Assistant, Mr. Elbert Bennett, to deliver a copy of the letter, personally, to Dr. Satcher. Dr. Satcher refused to accept the letter from Mr. Bennett. (Def.'s Ex. E). Dr. Davis instructed Mr. Bennet to return to Dr. Satcher's office and leave the letter with him. However, Dr. Satcher was not in his office so Mr. Bennett slid the letter under his office door for him to find upon his return. (Def.'s Ex. E; Def.'s Ex. D at p. 6). Dr. Satcher never requested a due process hearing on

his termination, even after the termination letters were mailed to his attorney.  Dr. Satcher never requested to speak with Chancellor Davis, Dr. Benjamin, Dean Willingham, or Dr. Tei regarding his termination or avail himself of the procedures available to tenured professors under Board policy.  (Def.'s Ex. D at p. 5-6).

Plaintiff filed this suit on August 26, 2004 alleging the Defendants violated his rights to Freedom of Speech and Due Process under the First and Fourteenth Amendments, as well as 42 U.S.C. § 1983, violations of Title VII for race discrimination and retaliation, 42 U.S.C. § 1981 for race discrimination and state law claims for breach of contract, outrage, false arrest, and battery. At this point in the litigation, the only remaining claims are Plaintiff's First Amendment retaliation claim, Due Process claim, and 42 U.S.C. § 1981 race claim brought pursuant to 42 U.S.C. § 1983 and Plaintiff's state law claims for breach of contract and outrage.  Each of these claims remains against the Board of Trustees of the University of Arkansas and Dr. Ebo Tei in his individual and official capacities.

<u>Standard for Summary Judgment</u>

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be

invoked carefully so that no person will be improperly deprived of a trial of disputed factual

issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*,

444 U.S. 991 (1979).  The Eighth Circuit set out the burden of the parties in connection with a

summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to
> demonstrate, *i.e.*, '[to] point out to the District Court,' that the
> record does not disclose a genuine dispute on a material fact.  It is
> enough for the movant to bring up the fact that the record does not
> contain such an issue and to identify that part of the record which
> bears out his assertion.  Once this is done, his burden is discharged,
> and, if the record in fact bears out the claim that no genuine dispute
> exists on any material fact, it is then the respondent's burden to set
> forth affirmative evidence, specific facts, showing that there is a
> genuine dispute on that issue.  If the respondent fails to carry that
> burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th

Cir. 1988) (citations omitted)(brackets in original)).  Only disputes over facts that may affect the

outcome of the suit under governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 248.

<u>Immunity</u>

The Board of Trustees of the University of Arkansas has Eleventh Amendment immunity

from Plaintiff's § 1983 claims, which includes Plaintiff's First and Fourteenth Amendment claims

and his claim of § 1981 race discrimination.  *Okruhlik v. University of Arkansas ex rel. May*  255

F.3d 615, 622 (8th Cir. 2001)("The University of Arkansas has been recognized to have Eleventh

Amendment immunity.")(citing *Assaad-Faltas v. University of Ark. For Med. Sciences*, 708 F.

Supp. 1026 (E.D. Ark.1989), affirmed, 902 F.2d 1572 (8th Cir. 1990)).

As stated, Plaintiff is also suing Dr. Tei in his official and individual capacities for

declaratory and injunctive relief as well as monetary damages.  Defendants seek sovereign

immunity for Dr Tei in his official capacity.  In addition, Defendants argue that Dr. Tei is not a "person" amenable to suit under § 1983 and must, therefore, be dismissed in his official capacity. The Court agrees.

Section 1983 *damage* claims against "individual defendants acting in their official capacities are likewise barred, either by the Eleventh Amendment or because in these capacities they are not 'persons' for § 1983 purposes." *Murphy,* 127 F.3d at 754 (citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S. Ct. 2304, 105 L.Ed.2d 45 (1989)).  Accordingly, the Court finds that Dr. Tei acting in his official capacity is immune from Plaintiff's § 1983 claims for money damages.

However, "[s]tate officials acting in their official capacities are § 1983 'persons' when sued for *prospective* relief, and the Eleventh Amendment does not bar such relief." *Id.* (citing *Trevelen v. Univ. of Minn.*, 73 F.3d 816, 819 (8th Cir. 1996)(emphasis added)).  Dr. Tei is not immune and is a "person" under § 1983 with respect to the prospective injunctive relief sought by Plaintiff.

Defendants argue that Dr. Tei is entitled to qualified immunity on the claims remaining against him.

> [G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).   For the reasons stated below, the Court finds that Plaintiff has failed to state a constitutional violation. Therefore, the Court need not consider the applicability of qualified immunity.

<u>First Amendment Claim</u>

It is clearly established that a public employer may not discharge an employee for

engaging in protected speech. *See Sexton v. Martin*, 210 F.3d 905, 910 (8th Cir. 2000).  In order

for an employee to state a claim under the First Amendment, he must show that his conduct was

constitutionally protected and that the protected conduct was a "substantial" or "motivating"

factor in the defendant's action which resulted in dismissal.  *Green v. St. Louis Housing Authority*,

911 F.2d 65, 70 (8th Cir. 1990).  Whether the protected conduct was a substantial or motivating

factor in an employment decision is a question of fact, but the sufficiency of the evidence to

create an issue of fact for the jury is solely a question of law.  *Cox v. Miller County R-I School

Dist.*, 951 F.2d 927, 931 (8th Cir. 1991).

The Court must analyze First Amendment employment retaliation claims with a three-step

burden-shifting test.

> First, a public employee must show that he suffered an adverse employment action that
> was causally connected to his participation in a protected activity.  Once the employee
> satisfies his initial burden, the burden shifts to the employer to show a legitimate,
> nondiscriminatory reason for his or her actions.  If the employer meets this burden, the
> burden shifts back to the employee to show that the employer's actions were a pretext for
> illegal retaliation.  This third step of showing that a defendant's justification for firing is
> unworthy of credence is harder to overcome than the prima facie case because evidence of
> pretext is viewed in the light of the employer's justification.

*Morris v. City of Chillicothe,*  512 F.3d 1013, 1018 -1019 (8th Cir. 2008)(citing *Duffy v.

McPhillips*, 276 F.3d 988, 991 (8th Cir. 2002); *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827,

834 (8th Cir. 2002)).

Plaintiff contends that he was terminated because he spoke out on matters raised in his

previous lawsuit and because of his filing of his previous lawsuit which exposed Defendant

Davis' and Benjamin's endorsement of Defendant Tei's "illegal and discriminatory employment

and hiring practices."  (Complaint at p. 6).

However, the evidence shows that Plaintiff began threatening to file another lawsuit or

reopen his previous lawsuit in 2000.  Plaintiff was not terminated until October of 2003 with an

effective date of October of 2004.  Thus, there is no temporal connection between the two actions.

Further, there is no evidence of any kind supporting a causal connection between Plaintiff's

speech and his termination.

In addition, Defendants have provided a legitimate nondiscriminatory reason for their

termination of Plaintiff's employment.  Defendants contend that Plaintiff was terminated for

unwillingness to perform his duties or fulfill his responsibilities to UAPB, including neglect of

duty, insubordination, and creation of a hostile work and study environment.  Plaintiff's only

evidence of pretext is letters and memos written by Dr. Tei wherein Dr. Tei is critical of Plaintiff

and letters of complaint about other staff members by students.  These do not establish pretext.

The evidence supports Defendants' reason for Plaintiff's termination.  Numerous incident reports

with the campus police, Plaintiff's documented failure to attend meetings, Plaintiff's failure to

provide his Western Civilization syllabus for over a year, and Plaintiff's failure to submit a

written report on his research during his 1999 paid sabbatical are ample support for Defendants'

decision to terminate Plaintiff's employment.  Therefore, Defendants' Motion for Summary

Judgment of Plaintiff's First Amendment claim is GRANTED.

Due Process Claim

Procedural due process claims require a two-step analysis.  Initially, a plaintiff must

demonstrate that the state deprived him of some "life, liberty, or property" interest.  If successful,

the plaintiff must then establish that the state deprived him of that interest without sufficient

"process."  *Krentz v. Robertson,* 228 F.3d 897, 902 (8th Cir. 2000).  Defendants do not dispute that

Plaintiff had a property interest in his position with UAPB.  Plaintiff was a tenured professor at

UAPB and, thus, had a property right to continued employment.  However, Defendants contend

24

that Plaintiff has waived his right to argue that he was deprived of his property interest without sufficient process.

Plaintiff was offered the opportunity to challenge his termination.  Defendants sent Plaintiff multiple letters informing him of meetings to discuss his situation, informing him of his termination, the reasons for his termination, and his right to challenge the actions taken against him.  The letters were eventually forwarded by UAPB to Plaintiff's counsel.  However, Plaintiff refused to attend any of the meetings or to request an appeal at any time.  The fact that Plaintiff refused to accept these letters does not provide Plaintiff with a due process claim.  "[A]n employee waives a procedural due process claim by refusing to participate in post-termination administrative or grievance procedures made available by the state." *Krentz,* 228 F.3d at 904 (citing *Riggins v. Board of Regents of the Univ. of Neb.*, 790 F.2d 707, 711 (8th Cir.1986); *Bohn v. County of Dakota*, 772 F.2d 1433, 1441 (8th Cir.1985)).  The Court finds that Plaintiff waived his due process claim.  Defendants' Motion for Summary Judgment of Plaintiff's Due Process claim is GRANTED.

### Substantive Due Process

In order to prove a violation of an individual's substantive due process rights, a plaintiff must show that the official acted in an arbitrary or capricious manner, or so as to shock the conscience.  *Herts v. Smith,*  345 F.3d 581, 587 -588 (8th Cir. 2003)(citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Harrah Independent School District v. Martin*, 440 U.S. 194, 198, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979) (per curiam)). The constitutional right to substantive due process includes a right to be "free from discharge for reasons that are 'arbitrary and capricious,' or in other words, for reasons that are trivial, unrelated to the education process, or wholly unsupported by a basis in fact." *Id. (*citing *North Dakota State*

*University v. United States*, 255 F.3d 599, 605 (8th Cir. 2001).  The Eighth Circuit has stated, "an

official's conduct must generally be intended to inflict harm to be conscience shocking in the

constitutional sense." *Id.*(quoting *Hawkins v. Holloway*, 316 F.3d 777, 788 (8th Cir. 2003)

(finding a substantive due process violation where a sheriff  threatened to shoot employees with a

loaded handgun)).

Defendants' actions in terminating Plaintiff's contract with UAPB do not rise to the level

of conscience shocking.  The reasons given for Plaintiff's discharge were not trivial.  They were

related to the educational process.  They are supported by a basis in fact.  Therefore, Plaintiff's

Motion for Partial Summary Judgment of his due process claim is DENIED.  Defendants' Motion

for Summary Judgment on Plaintiff's due process claim is GRANTED.

### 42 U.S.C. § 1981 Claims

"A plaintiff establishes a prima facie case under § 1981 by showing (1) membership in a

protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and

(3) discrimination interfering with a protected activity."  *Daniels v. Dillard's, Inc.,* 373 F.3d 885,

887 (8th Cir. 2004).  The elements of claims alleging disparate treatment on the basis of race under

Title VII and intentional employment discrimination on the basis of race under § 1981 and § 1983

are identical.  *Kim v. Nash Finch Co.,*123 F.3d 1046, 1063 (8th Cir. 1997)(quoting *St. Mary's*

*Honor Center v. Hicks*, 509 U.S. 502, 506 n. 1(1993)).  Plaintiff has not provided any evidence to

show that he was discriminated against on the basis of his race.  (Exhibit N, p. 307-309).  Further,

the fact that Dr. Tei (as well as all of Plaintiff's supervisors, Dr. Davis, Dr. Benjamin, and Dr.

Willingham) belong to the same protected class as Plaintiff and that UAPB is a historically black

university considerably undermine the probability that race was a factor in Plaintiff's termination.

Plaintiff's evidence of race discrimination is insufficient to allow a reasonable juror to infer that

Plaintiff's race actually motivated Defendants' decision to terminate him.  Therefore, Defendants'

Motion for Summary Judgment of Plaintiff's § 1981 claim is GRANTED.

State Law Claims

The Court has dismissed all of the claims over which it had original jurisdiction, i.e., First

Amendment, Due Process, and 42 U.S.C.§ 1981.  The Court declines to accept supplemental

jurisdiction over Plaintiff's remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3)(district court

may reject supplemental jurisdiction if the court has dismissed all claims over which it had

original jurisdiction.)

Conclusion

Defendants' Motion for Summary Judgment (Docket # 22) is GRANTED.  Plaintiff's

Motion to Amend (Docket # 34) is DENIED as futile.    Plaintiff's Motion for Partial Summary

Judgment (Docket # 38) is DENIED.  Defendant's Motion to Deem Admitted (Docket # 39) is

DENIED.  Defendants' Motion to Strike Plaintiff's Motion for Partial Summary Judgment

(Docket # 42) is MOOT.  The Clerk is directed to close the case.

IT IS SO ORDERED this 1ST day of April 2008.


_____

James M. Moody
United States District Judge